UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
HAIFENG XIE,

                  Plaintiff,                        MEMORANDUM AND ORDER
                                                17-CV-7509 (ILG) (JO)
     v.


SAKURA KAI I INC. d/b/a SAKURA
JAPANESE CUISINE,
YOULIN WANG, and
"JOHN" CHEN,

                  Defendants.
--------------------------------------------------------x
GLASSER, Senior United States District Judge:

       Plaintiff Haifeng Xie (**"Plaintiff"**) brings this action against Defendants Sakura Kai I Inc. d/b/a Sakura Japanese Cuisine (**"Sakura"**), Youlin Wang (**"Wang"**) and "John" [*sic*] Chen (**"Chen"**), for violations of, *inter alia*, the Fair Labor Standards Act (**"FLSA"**), 29 U.S.C. § 201, *et seq.* and the New York Labor Law (**"NYLL"**). Specifically, Plaintiff alleges that: (I) Defendants failed to pay the federally-mandated minimum wage (ECF No. 7 (Am. Compl.) ¶¶ 69-73), 29 U.S.C. § 506(a) (Count I); (II) Defendants failed to pay the New York State-mandated minimum wage (Am. Compl. ¶¶ 74-79), NYLL § 652(1) (Count II); (III) Defendants failed to pay federally-mandated overtime compensation (Am. Compl. ¶¶ 80-87), 29 U.S.C. § 207(a) (Count III); (IV) Defendants failed to pay New York State-mandated overtime compensation (Am. Compl. ¶¶ 88-95), 12 N.Y.C.R.R. § 142-2.2 (Count IV); (V) Defendants failed to pay New York State-mandated spread of hours pay (Am. Compl. ¶¶ 93-95), 12 N.Y.C.R.R. § 146-1.6 (Count V); (VI) Defendants failed to provide meal periods as required by NYLL § 162 (Am. Compl. ¶¶ 96-100) (Count VI); (VII) Defendants failed to keep records as required under 12 N.Y.C.R.R. § 146-2.1 (Am. Compl. ¶¶ 101-105); (VIII) Defendants failed to provide time of hire

wage notices as required under NYLL § 195(1)(A) (Am. Compl. ¶¶ 106-110); (IX) Defendants failed to provide pay stubs as required under NYLL § 195(3) (Am. Compl. ¶¶ 111-114) (Count IX); (X) Defendants breached an implied contract of reimbursement for the costs and expenses of maintaining his delivery vehicle (Am. Compl. ¶¶ 115-124) (Count X); (XI) Defendants retaliated against Plaintiff in violation of 29 U.S.C. § 215(a)(3) (Am. Compl. ¶¶ 125-129) (Count XI); (XII) Defendants retaliated against Plaintiff in violation of NYLL § 215 (Am. Compl. ¶¶ 130-133) (Count XII); (XIII) Defendants filed fraudulent returns under 26 U.S.C. § 7434 (Am. Compl. ¶¶ 134-136) (Count XIII); and (XIV) Defendants filed fraudulent information returns in violation of New York General Business Law ("**GBL**") § 349 (Am. Compl. ¶¶ 137-140) (Count XIV).

Plaintiff's initial complaint was filed on December 27, 2017, naming Sakura, his employer, and Wang, its manager, as Defendants, and pleading all of the aforementioned causes of action other than the retaliation claims. (ECF No. 1 (Compl.)). Two days later, on December 29, 2017, Plaintiff filed his amended complaint, adding "John" Chen,[1] Plaintiff's "[b]oss," as a Defendant, and alleging that Chen unlawfully terminated him after he refused to withdraw his lawsuit. (Am. Compl. ¶¶ 18-20, 57, 125-133). On the same day he filed his amended complaint, Plaintiff moved for a temporary restraining order reinstating his job at Sakura, accompanied by a sworn declaration by Plaintiff describing how Chen had unlawfully terminated him. (ECF Nos. 8 (Notice of Emergency Motion), 8-2 (Xie Decl.)). The Court ordered Plaintiff reinstated on January 8, 2018. (ECF No. 18).

Plaintiff's complaint was originally brought on behalf of himself and a putative class. During the initial conference, however, Plaintiff's counsel acknowledged that there does not

---

[1] "John" Chen's first name is given quotation marks in Plaintiff's amended complaint.

exist a putative class including more than 40 members. (ECF No. 29). Therefore, the requests for collective and class actions were deemed abandoned. (*Id.*).

The parties submitted briefing and proposed findings of fact on February 18, 2019 (ECF Nos. 44, 46, 47), and a bench trial was conducted on March 4 and 5, 2019 (ECF Nos. 50, 51). The Court heard from three witnesses at trial. The only witness who testified on Plaintiff's behalf was Plaintiff himself. For the defense, the Court first heard testimony from Jingcheng Liang, a current employee at Sakura who worked there during the duration of Plaintiff's employment. (Liang 84:20-85:1). The Court then heard testimony from Wang, who exercised supervisory responsibilities over Plaintiff and owned 60% of the business. (Xie 9:24-10:1; Wang 129:4-9). Throughout trial, the Court assessed the tone, demeanor, and responsiveness of the witnesses, which informs its determination as to their credibility.

Based on its examination of the evidence at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a).

## DISCUSSION

**1. Time Period Covered by Plaintiff's Amended Complaint**

Plaintiff's amended complaint was filed December 29, 2017, after he was allegedly terminated, but prior to his reinstatement after this Court's January 8, 2018 order. The complaint was never further amended to encompass any claims which may have arisen in the course of Plaintiff's employment from January 8, 2018 onward. Accordingly, Plaintiff's claims are restricted to the events occurring on and before December 29, 2017.

**2. Claims Against "John" Chen**

Inexplicably, despite naming "John" Chen as a Defendant and submitting a detailed affidavit describing Chen's conduct, Plaintiff never presented any evidence regarding Chen at

trial, or even referred to his existence. Furthermore, Plaintiff's testimony established that some of the interactions he claimed to have had with Chen were actually with Wang. *See* Discussion 9, *infra*.[2] Indeed, the only mention of Chen at trial was when counsel for the defense announced his appearance on behalf of all Defendants "except for John Chen." (2:8-9). Under the circumstances, the Court is compelled to find that "John" Chen is a spectre—he simply does not exist. This is, of course, a startling contradiction between Plaintiff's sworn affidavit and subsequent testimony, and one that emphatically taints his credibility on the remaining issues. Accordingly, all claims against Chen are dismissed.

### 3.    Counts I through V: Minimum Wage, Overtime, and Spread of Hours Claims

Counts I through V plead violations of federal and state minimum wage and overtime laws and regulations, as well as state regulations concerning spread of hours pay. *See* 29 U.S.C. §§ 206(a), 207(a)(1); NYLL § 652(1); 12 N.Y.C.R.R. §§ 142-2.2, 146-1.6(a). Defendants do not dispute that these laws and regulations apply to them. Because the federal and state claims involve common questions of fact—namely, the actual number and spread of hours that Plaintiff worked, and whether Plaintiff was adequately compensated therefor—they may be considered together.

A.    <u>Statutory framework</u>

i.    *Minimum wage*

At all relevant times, the federal minimum wage was $7.25 per hour. 29 U.S.C. § 206(a). The New York State minimum wage was $9.00 per hour before December 31, 2016. NYLL §

---

[2] Specifically, Plaintiff testified that it was Wang who told him not to return to work until he withdrew his initial complaint. (Xie 36:22-37:19, 38:8-12). But Plaintiff's amended complaint and accompanying declaration claim that it was Chen who said this to him. (Am. Compl. ¶ 57; Xie Decl.).

652(1). On and after December 31, 2016, the state minimum wage was increased to $10.50 per hour for New York City employers with 10 or fewer employees. *Id.* § 652(1)(a)(ii).

ii.    *Overtime*

Federal law requires that, subject to exceptions not applicable here, employees covered by the FLSA who work longer than 40 hours in a given week be paid 1 ½ times "the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). The NYLL incorporates this federal overtime requirement by reference. 12 N.Y.C.R.R. § 142-2.2. U.S. Department of Labor regulations provide that "[i]f the employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113(a). However, "[t]he regular rate of pay … may in no event be less than the statutory minimum." *Id.* § 778.107.

iii.   *Spread of hours*

For restaurant workers, New York Department of Labor regulations provide that, "[o]n each day on which the spread of hours exceeds 10, an employee shall receive on additional hour of pay at the basic minimum hourly rate." *Id.* § 146-1.6(a). The spread of hours is defined as "the length of the interval between the beginning and end of an employee's workday" and "includes working time plus time off for meals plus intervals off duty." *Id.* § 146-1.6.

iv.    *Tip credits*

Under both state and federal law, employers may credit an employee's tips toward their wage under certain circumstances. *See* 29 U.S.C. § 203(m); 12 N.Y.C.R.R. § 146-1.3. However, in order to do so, the employer must provide certain notices concerning the tip credit to the employee. *See* 29 U.S.C. § 203(m); 12 N.Y.C.R.R. §§ 146-1.3; 146-2.2. Specifically, to claim a

tip credit for federal purposes, the employer must "inform[]" the employee "of the provisions of" 29 U.S.C. § 203(m), the statute that provides for it. 29 U.S.C. § 203(m)(2)(A). To claim a tip credit for New York minimum wage purposes, the employer must, "[p]rior to the start of employment," give the employee written notice of "the amount of tip credit, if any, to be taken from the basic minimum hourly rate." 12 N.Y.C.R.R. § 146-2.2(a); *see id.* § 146-1.3. The defendant has the burden of proving compliance with these requirements. *See Velez v. 111 Atlas Restaurant Corp.*, No. 14-CV-6956 (MKB) (CLP), 2016 WL 9307471, at *9 (E.D.N.Y. Aug. 11, 2016).

v.      *Meal breaks*

For federal minimum wage purposes, employers may exclude "bona fide meal breaks" from an employee's working hours. 29 C.F.R. § 785.19(a). Applicable regulations provide:

> Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minute or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

*Id.* Courts have generally held that bona fide meal breaks are non-compensable for NYLL purposes as well. *See Gamero v. Koodo Sushi Corp.*, 272 F.Supp.3d 481, 499 (S.D.N.Y. 2017); *Hart v. Rick's Cabaret Intern., Inc.*, 60 F.Supp.3d 447, 475 n. 15 (S.D.N.Y. 2014).

B.      Findings concerning Plaintiff's hours and compensation

i.      *Burden of proof*

Under both the FLSA and the NYLL, the initial burden of proof as to liability rests with the plaintiff. By law, employers are required to keep and maintain accurate payroll records reflecting the number of hours worked and the wages received by each employee. *See* NYLL §

195(4); 12 N.Y.C.R.R. § 146-2.1(a). However, where such records are non-existent or inadequate, "employees need only prove that they performed work for which they were not properly compensated and produce 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.' " *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 69 (2d Cir. 1997) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). To this end, "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). If the Court finds Plaintiff's testimony credible, then the employer must "come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence." *Reich*, 121 F.3d at 69 (quoting *Anderson*, 328 U.S. at 687-688). However, there is nothing that requires the Court to credit the plaintiff's testimony. *See Daniels v. 1710 Realty LLC*, 497 Fed. Appx. 137, 139 (2d Cir. 2012) (summary order). If the Court finds the plaintiff's testimony to be incredible, then it may simply decide that the plaintiff failed to carry his initial burden of proof. *See id.*

ii.    *Evidence concerning hours and compensation*

Plaintiff worked at Sakura from August 19, 2016 until December 29, 2017. (Xie 4:15, 38:25-39:3; Pl. Ex. 6 / Def. Ex. A, D0046; Def. Ex. B).[3] The restaurant is located in Queens, New York and had approximately seven employees. (Wang 129:14-15, 130:11-12). While at Sakura, Plaintiff made deliveries, washed dishes, took out the garbage, and helped out with other

---

[3] Following this Court's order reinstating Plaintiff (ECF No. 18), he resumed work in January 2018 until March or April 2018. (Xie 39:3, 50:15; Pl. Ex. 6 / Def. Ex. A, D0048-59; Def. Ex. A-a). At the time of trial, he was no longer employed at Sakura. (Xie 55:7-9).

tasks. (Xie 14:2-7). He generally received $375 in cash per week. (*Id.* at 13:13-15; Wang 131:17-19, 172:25-173:2). This $375 was sometimes adjusted upwards or downwards if Plaintiff worked a greater or lesser number of hours in a given week. (Xie 23:24-24:3; Wang 189:20-190:12).

Defendants did not, during the relevant period, keep contemporaneous time or payroll records. (Wang 178:3-6). The only documents that provide a detailed record of the hours that Plaintiff might have worked are a series of handwritten work schedules corresponding to the period from March 13, 2017 to April 8, 2018 (Pl. Ex. 6 / Def. Ex. A, D0005-D0059; Def. Ex. A-a). Wang testified that these schedules were prepared at the beginning of each week (Wang: 134:7-22, 174:18-175:4, 184:1-4, 184:18-25) and represented the hours that each employee was expected to work (*id.* at 136:3-7). He characterized these documents as the employees' "normal working schedule." (*id.* at 175:14). At the end of each week, according to Wang, the pay received by each employee would be written down (*Id.* at 204:25-205:15).

These schedules show that, in most weeks, Plaintiff worked 38.5 hours and received a flat sum of $375—an effective wage of about $9.74 per hour. (Pl. Ex. 6 / Def. Ex. A, D0005-D0039). According to these documents, Plaintiff generally worked four days per week, on Mondays, Fridays, Saturdays, and Sundays. (*Id.*). They indicate that his workday started at 11:00 a.m. or noon and ended at 11:00 or 11:30 p.m., the precise start and end times varying by the day of the week. (*Id.*). The schedules also show that Plaintiff was given a mid-afternoon break from 2:30 p.m. to 5:00 p.m. on Mondays, Fridays, and Saturdays, and a break from 3:00 p.m. to 5:00 p.m. on Sundays. (*Id.*).

In contrast to what the schedules appear to show, Plaintiff testified that, prior to his reinstatement in January 2018, he worked *six* days per week, usually taking Tuesdays off. (Xie

21:13-17).[4] He testified that he had no breaks other than two 15-minute meal breaks, during which he remained on-call if a delivery came through. (*Id.* at 21:18-22:7). He testified that it was only *after* he was reinstated that his hours were reduced: after that point, he only worked four days per week and was given a mid-afternoon break at 2:00 or 2:30. (*Id.* at 30:6-13).

At trial, Plaintiff attempted to challenge the accuracy, if not the authenticity, of the schedules corresponding to the time period before this lawsuit was brought. None of these schedules were signed or initialed by any employees. (Pl. Ex. 6 / Def. Ex. A, D0005-D0046). By contrast, most of the schedules for January 2018 onwards are signed. (*Id.* at D0047-59; Def. Ex. A-a). Plaintiff testified that he never saw the schedules until he was reinstated on January 10, 2018, at which point he was required to sign them on a weekly basis. (Xie 15:8-11, 16:18-17:3). Wang testified that the employees "trusted each other" prior to Plaintiff's lawsuit, but that afterwards it became necessary to have each employee sign. (Wang 169:9-14).

iii.   *Evidence concerning withholding of December 2017 pay*

Plaintiff claimed that Wang withheld his pay "from the end of November" through the entire month of December 2017. (Xie 39:21-40:1, 40:24-25). According to Plaintiff, Wang had claimed that Plaintiff owed him an unrelated debt. (*Id.* at 45:5-11). Plaintiff testified that this debt was actually paid back and claimed that his pay was therefore withheld wrongfully. (*Id.* at 45:9-11).[5]

---

[4] Although not in evidence, Plaintiff's proposed findings of fact significantly contradicted his testimony at trial. The proposed findings of fact state that Plaintiff generally worked four days per week during the relevant period. (ECF No. 47 (Pl. Proposed Findings of Fact) ¶¶ 12-13).
[5] Plaintiff's testimony in this regard was inconsistent with his amended complaint, which alleges that wages were withheld from November 1 to 30 and from December 16 to 29, 2017. (Am. Compl. ¶¶ 43-44). The complaint alleges that the November wages were withheld because "Defendants told Plaintiff this was because they needed the money to cover other financial commitments." (*Id.* ¶ 43). Plaintiff testified to no such facts at trial.

Plaintiff gave the following explanation for how this debt arose. Wang told him he wanted to buy a "house" and proposed a transaction, to which Plaintiff agreed, whereby Wang would give Plaintiff cash and Plaintiff would give Wang a check for that amount. (*Id.* at 45:13-16). Wang gave Plaintiff $5,000 and asked him to deposit the money. (*Id.* at 45:18-19). Plaintiff then gave Wang a "blank" check, which Wang filled out for $5,000, writing in a third party ("possibly" named "Chang") as payee. (*Id.* at 45:19-24, 47:9-19). Nevertheless, according to Plaintiff, Wang claimed that he never received the check and therefore decided to withhold Plaintiff's pay. (*Id.* at 48:12-15).

On cross-examination, the defense questioned Plaintiff about a text that he sent Wang on December 17, 2017, which read: "The balance (is) 3700 dollar." (Def. Ex. B). Plaintiff explained that he sent this text because Wang "still needed a check for $3,700 and then asked me to send him a message to remind him about the figure because he was busy" (Xie 59:7-10). On redirect, the Plaintiff testified that his text regarding a $3,700 "balance" was a reminder for *Wang* to give *Plaintiff* $3,700 in cash, so that Plaintiff could write Wang a $3,700 check. (*Id.* at 78:8-13). He added that Wang never, in fact, gave Plaintiff the $3,700. (*Id.* at 78:14-16). He denied that he owed Wang $3,700 in December of 2017. (*Id.* at 59:17-20, 78:6-7).

Wang's testimony was that this arrangement never happened. He testified that Plaintiff's family had run into financial hardship and that he lent Plaintiff money to help him out. (Wang 201:21-202:16). This testimony was buttressed by a series of text messages between them. Plaintiff sent Wang a text on December 31, 2017—four days after the commencement of this lawsuit, and two days after Plaintiff's departure from Sakura—in which, among other things, he warned Wang that "[a]n employer will be seriously punished by law and pay huge damages, if wage payments are not made or delayed. … I hope you understand that tomorrow you need to

pay my wage on time. Avoid unnecessary huge loss." (Def. Ex. B). Wang responded that he never delayed wage payments, that Plaintiff could pick up his wages on January 1st or 2nd, and that Plaintiff still owed money that he had borrowed from Wang and others. (*Id.*). Plaintiff sent the following reply: "That's good! See you in court!" (*Id.*). At trial, in an unscripted moment of candor, the Plaintiff explained this last comment by saying "I never imagined [Wang] would use this $3,700 matter to put this over me. And, so, I was very disappointed in the way he handled this, so I said I'll see you in court." (Xie 60:20-22).

iv.    *Findings of fact concerning Plaintiff's hours and compensation*

The work schedules, when taken at face value, show that Plaintiff was paid less than the legally required wage. *See* Discussion 3.E, *infra*. Although questions have been raised as to the accuracy of these schedules, it is clear that, by introducing them as authentic and reasonably approximate records of Plaintiff's wages and hours, Defendants have set a floor as to their liability. The only genuine issue of fact is whether Defendants are *more* liable than these documents suggest. That is, did Plaintiff work more than the schedules show? Was he paid less than they show?

Plaintiff's credibility was significantly impaired by his meandering, contradictory testimony regarding the transaction he entered into with Wang. Plaintiff gave conflicting testimony regarding whether the value of this transaction was $5,000 or $3,700. His explanation that he was expected to give Wang a $3,700 check made little sense in light of his prior statements which contemplated that only a single, $5,000 check was to be paid. His testimony that Wang never gave him $3,700 and that he did not owe Wang any money in December 2017 was at odds with his rather extemporaneous remark that he "never imagined [Wang] would use this $3,700 matter to put this over me." And the Court finds it incredible on its face that Wang

11

would withhold wages from Plaintiff in order to collect a check that, according to Plaintiff, had already been delivered. It is clear that, by late December 2017, a serious dispute over money had evolved between Plaintiff and Wang. But Occam's Razor suggests that Wang's explanation—Plaintiff borrowed money and never repaid it—is closer to the truth than the unusual and circuitous transaction to which Plaintiff testified. The Court concludes that Plaintiff's testimony on this subject was less than forthright, which impugns his credibility, not only as to this discrete issue, but as to all of the other material issues in this case.

In the final analysis, it is Plaintiff's burden to show that he worked more hours, or was paid less, than what is reflected in the working schedules. This is a question of fact, and the only evidence upon which Plaintiff would be able to prevail on this question is his own purported recollection. But the force of this testimony hinges on his credibility as a witness, and the Court finds his credibility damaged by the foregoing inconsistencies. Accordingly, the only reasonable course is to adopt the schedules as an approximation of Plaintiff's actual wages and working hours between March 13 and December 29, 2017.[6] These schedules establish a floor as to Defendants' liability, and there is nothing in the trial record that would justify a finding of greater liability.

To be sure, the schedules are no substitute for contemporaneous time records. They do not state Plaintiff's hours with mathematical exactitude, and they are not signed or otherwise self-authenticating. But Plaintiff has failed to persuade the Court, with *credible* testimony, that any doubts as to the accuracy of these documents should be resolved in his favor.

---

[6] As to those periods for which no schedules are available, *i.e.* August 19, 2016 to March 12, 2017, inclusive, the Court finds that the Plaintiff's hours may be reasonably approximated based on the schedules corresponding to the period from March 12 to November 12, 2017.

C.      Findings concerning tip credits

Wang testified that, prior to the start of Plaintiff's employment, it was agreed that Plaintiff would be entitled to retain his tips, which Wang estimated to be approximately $50 per day. (Wang 168:14-23, 174:2). However, Wang did not tell Plaintiff that he would take a tip credit and did not give Plaintiff a written statement, as required, explaining what a tip credit was or what Plaintiff's wage rate would be. (*Id.* at 173:16-22, 174:3-8). Wang also never explained the provisions of 29 U.S.C. § 203(m) to Plaintiff. (*Id.* at 174:9-12). Accordingly, the Court finds that Plaintiff was not furnished with the tip credit notices required under 29 U.S.C. § 203(m)(2)(A) or 12 N.Y.C.R.R. § 146-2.2.

D.      Findings concerning meal breaks

Plaintiff claimed that he had two, 15-minute meal breaks (Xie 21:21-22:7). Liang testified that employees had two, 15-minute meal breaks, before correcting himself and stating that employees had three 15-minute breaks. (Liang 85:19-87:6). Wang testified that employees had three meal breaks: a 15-minute break for breakfast, a 30-minute break for lunch and a 30-minute break for dinner. (Wang 170:23-171:8). No meal breaks are recorded in the written schedules.

Although Plaintiff and Liang are imperfect witnesses, the Court credits their testimony and finds that meal breaks were only 15 minutes in length.

E.      Conclusions concerning Defendants' liability

As previously noted, the Court will rely on the working schedules as a reasonable approximation of the hours that Plaintiff worked and the pay he received; for those periods where schedules are unavailable, the Court will presume that Plaintiff worked the same hours and received the same weekly pay that he did for the period between March 13 and November

12, 2017. *See* Discussion 3.B.iv, *supra*. The schedules reflect that on each working day (except for December 29, 2017), Plaintiff's workday began no later than 12:00 p.m. and ended no sooner than 10:30 p.m.; accordingly, his "spread of hours," as that term is used in 12 N.Y.C.R.R. § 142-2.2, exceeded ten on each of these days. No adjustments will be made for any tips that Plaintiff may have received, because the trial record shows that Plaintiff was not provided with the requisite tip credit notices. *See* Discussion 3.C, *supra*. Likewise, no adjustments will be made for meal periods, because Plaintiff was not afforded "bona fide meal periods" of at least half an hour. *See* 29 C.F.R. § 785.19(a); Discussion 3.D, *supra*.

Based on these findings of fact and conclusions of law, the Court calculates that Plaintiff was paid more than the federal minimum wage, but less than the state minimum wage (taking into account overtime and spread of hours pay), in every week between August 19, 2016 and December 29, 2017, inclusive. The cumulative amount of this underpayment is $4,024.53. The Court's calculations are set forth in an Appendix to this opinion.

Accordingly, judgment should be entered in Plaintiff's favor as to Counts II, IV and V in the amounts set forth below.

F.    Damages

A plaintiff aggrieved by an employer's violation of the New York minimum wage law is entitled to double the amount of underpayment, half of which is deemed to be liquidated damages. *See* NYLL §§ 198(1-a), 663(1). This liquidated damages remedy applies to claims for unpaid overtime compensation and spread of hours pay as well. *See Romero v. Rung Charoen Sub, Inc.*, No. 16-CV-1239 (VMS), 2017 WL 4480758, at * 13 (E.D.N.Y. Sept. 30, 2017) (plaintiffs are entitled to liquidated damages for spread of hours claims); *Islam v. Hossain*, 44 Misc.3d 1216(A) (N.Y. Civ. Ct. 2014) (plaintiffs are entitled to liquidated damages for overtime

claims). A prevailing plaintiff is also entitled to "reasonable attorney's fees" and prejudgment interest as required under N.Y. Civ. Prac. L. & R. (**"CPLR"**) 5001. NYLL § 198(1-a).

Liquidated damages may not be awarded if "the employer proves a good faith basis to believe that its underpayment of wages was in compliance with law." NYLL §§ 198(1-a), 663(1). This exception reflects the fact that liquidated damages are ultimately punitive in nature. *See Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 265 (2d Cir. 1999) ("[L]iquidated damages under the Labor Law 'constitute a penalty' to deter an employer's willful withholding of wages due") (citing *Carter v. Frito-Lay, Inc.*, 74 A.D.2d 550 (N.Y. App. Div. 1st Dept. 1980), *aff'd*, 52 N.Y.2d 994 (N.Y. 1981)), *cert. denied*, 528 U.S. 1119 (2000). Obviously, a penalty whose object is to deter wrongful conduct cannot, and should not, be applied against one who did not understand their conduct to be wrongful. The NYLL places the burden on the employer to prove good faith, not upon the employee to disprove it. *See* NYLL §§ 198(1-a), 663(1) (liquidated damages shall be allowed "unless the employer proves a good faith basis…").[7]

In analyzing the liquidated damages provision of the NYLL, we may look to case law discussing the liquidated damages provision of the FLSA for guidance. *See Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018) ("[I]t is clear that the New York State legislature rewrote its liquidated damages provision to cover the same ground as the FLSA"); *Inclan v. New York Hospitality Group, Inc.*, 95 F.Supp.3d 490, 505 (S.D.N.Y. 2015) ("[C]ourts have not substantively distinguished the federal standard from the current state standard of good faith").

---

[7] Prior to November 24, 2009, the NYLL required the plaintiff to affirmatively prove that the employer's violation was willful. *See Zubair v. EnTech Engineering P.C.*, 900 F.Supp.2d 355, 360 n. 3 (S.D.N.Y. 2012). This requirement was removed in connection with amendments to the NYLL that conformed the liquidated damages provision to the FLSA. *See id.* Because all of the violations in this case occurred after the effective date of these amendments, no showing of willfulness by Plaintiff is required.

The Second Circuit has described the employer's burden of proving good faith as "a difficult one to meet" and has held that "double damages are the norm, single damages the exception." *Reich*, 121 F.3d at 71 (2d Cir. 1997) (citations, internal quotation marks and alterations omitted). The Second Circuit has also rejected the view that the absence of subjective malice or bad faith, on its own, is sufficient to invoke the exception. The employer must show *both* that it "acted in 'subjective good faith' *and* had objectively 'reasonable grounds' for believing that [its] acts or omissions" did not violate the law. *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) (emphasis added); *see also Reich*, 121 F.3d at 71 (" 'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development"); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 909 (3d Cir. 1991) ("[T]he district court's finding that 'there is no evidence in the record to suggest that [defendant] knowingly and willfully intended to avoid compliance with the Act' is not by itself enough to support the finding of reasonable good faith. A showing that the employer 'did not intentionally violate the Act' falls short of satisfying the objective component of the good faith requirement"), *cert. denied*, 503 U.S. 936 (1992). Such "objectively reasonable grounds" may include, for example, reliance on judicial decisions, the acts or opinions of a government agency, the advice of an attorney, prevailing practice in the industry, or the provisions of a collective bargaining agreement. *See* 26 A.L.R. Fed. 607 §§ 7(b), 8, 9, 10, 11. But a mere mistake will not suffice unless the "employer … took 'active steps to ascertain the dictates of the [law] and … to comply with them.' " *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 159 (2d Cir. 2008) (quoting *Herman*, 172 F.3d at 142).

In this case, Defendants have not met their "difficult" burden. To the contrary, the evidence suggests that Defendants were aware of law's requirements and did not comply with

them. Wang testified that, as early as 2016, his business partner at Sakura explained to him the provisions of a New York Department of Labor poster, which contained all of the applicable rules concerning minimum wage, overtime and spread of hours compensation. (Wang 180:4-25; Pl. Ex. 10). Additionally, Wang testified that wages at Sakura were increased in January 2018— shortly after this lawsuit was commenced—to adhere to the minimum wage that became effective for the new year. (Wang 142:19-143:5). Despite the fact that Defendants were aware of these requirements, they provided no explanation as to why they were not adhered to during the time period relevant to this lawsuit.

Accordingly, Plaintiff is entitled to damages for Counts II, IV and V in the amount of $4,024.53 in unpaid wages and an additional $4,024.53 in liquidated damages, together with attorney's fees and prejudgment interest as calculated below. *See* Discussion 12, *infra*.

**4.     Count VI: Meal Breaks**

Count VI, asserting a claim under NYLL § 162 for failure to provide meal breaks, fails as a matter of law because there exists no private right of action under this statute. *See Hill v. City of New York*, 136 F.Supp.3d 304, 350-351 (E.D.N.Y. 2015) (collecting cases).

**5.     Count VII: Recordkeeping**

Count VII, asserting a claim under 12 N.Y.C.R.R. § 146-2.1 for Defendants' alleged failure to keep, maintain and preserve certain employment records, also fails as a matter of law because there is no private right of action under this provision. *See In re Domino's Pizza Inc.*, No. 16-CV-6274, 2018 WL 1587593, at *7 (S.D.N.Y. Mar. 27, 2018).

**6.     Count VIII: Time of Hire Notices**

NYLL § 195 provides, in relevant part:

Every employer shall:

1. (a) provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; …. Each time the employer provides such notice to an employee, the employer shall obtain from the employee a signed and dated written acknowledgement, in English and in the primary language of the employee, of receipt of this notice, which the employer shall preserve and maintain for six years. … For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the notice must state the regular hourly rate and overtime rate of pay[.]

For a violation of § 195(1)(a), the Plaintiff may recover $50 per work day in which the violations occur, but no more than $5,000, "together with costs and reasonable attorney's fees." *Id.* § 198(1-b).

Here, Wang conceded that Plaintiff was never provided with a written statement of his agreed-upon wage rate. (Wang 173:16-22). This violation was ongoing up until the date of this lawsuit and and, *a fortiori*, exceeded 100 days in length. Accordingly, Plaintiff is entitled to the statutory maximum of $5,000, together with costs and reasonable attorney's fees.

7. **Count IX: Pay Stubs**

NYLL § 195 provides, in relevant part:

Every employer shall: …

3. furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day week, salary, piece, commission, or other gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages. For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the statement

shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

For a violation of § 195(3) the Plaintiff may recover $250 for each payment date in which the violation occurs,[8] but no more than $5,000, "together with costs and reasonable attorney's fees." *Id.* § 198(1-d). This penalty is in addition to any penalty that may be imposed under § 198(1-b) for failure to provide time-of-hire notices. *See Vega v. K & C Interior Construction Corp.*, No. 18-CV-182, 2018 WL 4376486 (ARR) (RER), at *17 (E.D.N.Y. Aug. 28, 2018), *report and recommendation adopted*, 2018 WL 4374911 (E.D.N.Y. Sept. 13, 2018); *Bustamente v. Uno Café & Billiards Inc.*, No. 15-CV-4192 (FB) (RML), at *3 (E.D.N.Y. May 23, 2018).

Here, the testimony established that Plaintiff did not provide his social security number to Wang until after this lawsuit was commenced and, accordingly, was not given pay stubs with his pay during the period relevant to this lawsuit. (Xie 14:17-19, 61:8-62:9; Wang 166:1-4, 190:23-24). Although Wang initially testified that certain documents introduced at trial (Pl. Ex. 11/Def. Ex. G) were "pay stubs" (Wang 164:18, 165:9), he later corrected this testimony and clarified that they were a payroll run rather than pay stubs (Wang 190:23-24). In any event, the documents originally identified by Wang as Plaintiff's "pay stubs" do not apply to any payroll periods before this lawsuit. (Pl. Ex. 11/Def. Ex. G).

Therefore, the Court finds that Defendants did not provide Plaintiff with pay stubs until January 2018 at the earliest. This violation was ongoing up until the date of this lawsuit and, *a*

---

[8] The statute states that the plaintiff is entitled to $250 per "work day" in which the violation occurs. NYLL § 198(1-d). However, it is obvious that the intent of the statute was to only count work days on which wages are actually paid, and not to count work days in between pay periods. *See Draskovic v. Oneota Associates, LLC*, No. 17-CV-5085 (ARR) (JO), 2019 WL 783033, at *16 (E.D.N.Y. Feb. 21, 2019) (counting the number of pay periods).

*fortiori*, exceeded 20 pay periods. Accordingly, Plaintiff is entitled to the statutory maximum of $5,000, together with costs and reasonable attorney's fees.

**8.      Count X: Breach of Implied Contract for Reimbursement**

Plaintiff's claim for breach of an implied contract for reimbursement is predicated entirely on his testimony that he was required to spend $300 on batteries for his delivery bike. (Xie 27:1-5, 27:22-23, 28:23-29:4). Because the Court does not generally find Plaintiff's testimony to be credible, *see* Discussion 3.B.iv, *supra*, it declines to credit this portion of his testimony. Accordingly, Plaintiff does not prevail under Count X.

**9.      Counts XI and XII: Retaliation**

The FLSA prohibits an employer from terminating an employee because the employee filed a complaint or instituted a proceeding against the employer under the FLSA. *See* 29 U.S.C. § 215(a)(3). The NYLL contains an analogous provision. *See* NYLL § 215(1)(a).

At trial, Plaintiff testified that, after Wang learned about the lawsuit, he confronted Plaintiff in the restaurant's kitchen. (Xie 36:22-24, 38:8-12). As Plaintiff was still an employee of the restaurant at the time, he was worried that Wang might retaliate against him, so he denied that he had filed the lawsuit. (*Id.* at 37:1-3). Wang then called a number on his cellphone, presumably Plaintiff's attorney, and told him, falsely, that there was "no such person as Xie Haifeng" at the restaurant. (*Id.* at 37:5-7). Wang then demanded that Plaintiff accompany him in his car and that they drive to his attorney's office to withdraw the complaint. (*Id.* at 37:7-10). Halfway through the trip, Plaintiff pointed out that it would look odd for the two of them to appear together, since Wang had just said on the phone that no one named Xie Haifeng worked there. (*Id.* at 37:10-14). Wang became angry and told him: "[Y]ou take care of this, otherwise if you don't take care of this, don't go back to work." (*Id.* at 37:14-16). Wang then drove Plaintiff

back to the restaurant, and Plaintiff called a car service "to go to Flushing" (*id.* at 37:16-19)—presumably to his attorney's offices, which are located in Flushing. Plaintiff testified that this interaction occurred at approximately 2:00 p.m. on December 29, 2017. (*Id.* at 38:21-25). Plaintiff's amended complaint (adding the retaliation claim) and motion for a temporary restraining order was filed that same day.

On December 31, 2017, Plaintiff sent Wang a text message, warning Wang that "[i]f an employer fires worker for no reason, the employer needs to make one month's more pay" (Def. Ex. B). Wang replied, "[i]t was not the case that I fired you for no reason. It was that you left restaurant without coming back to work in the evening of Friday, the 29th day of this month." (*Id.*). At trial, Wang testified point blank that he did not "fire" Plaintiff (Wang 153:5-7), but the above-quoted exchange suggests that he did, albeit for non-retaliatory reasons.

While Wang's testimony appears to be inconsistent with the text messages, Plaintiff's credibility was also damaged. In connection with his motion for a temporary restraining order, Plaintiff submitted a sworn statement, dated the same day as his alleged termination, claiming that it was ***"John" Chen***, rather than ***Wang***, who fired him. (Xie Decl.). Virtually all of the details of Plaintiff's trial testimony matched up with the affidavit, the sole exception being that Plaintiff now claimed it was a different person with whom he had the above-described encounter. (Xie 38:8-12).

In sum, serious questions concerning the credibility of *both* witnesses preclude the Court from making heads or tails of what really happened on December 29, 2017. But it is Plaintiff's affirmative burden to demonstrate that he was retaliated against in violation of the FLSA and/or the NYLL. Accordingly, Plaintiff does not prevail under Counts XI and XII.

**10.    Count XIII: Filing of False Internal Revenue Service Returns**

26 U.S.C. § 7434 provides: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." The statute provides for a right of action for "actual damages sustained by the plaintiff as a proximate result of the filing of the fraudulent information return," plus costs and, in the court's discretion, attorney's fees. *Id.* § 7434(b).

The parties did not brief Plaintiff's claim under this statute, and the issue was excluded from the parties' proposed pretrial order listing "Plaintiff's Claims Remaining to be Tried." (ECF No. 48 (Proposed Pretrial Order) at 2-3). Assuming the claim has not been abandoned, it fails nonetheless. Courts are reluctant to infer a violation of 26 U.S.C. § 7434 solely from an underlying FLSA or NYLL violation. *See In re Domino's Pizza*, 2018 WL 1587593, at *8 (dismissing 26 U.S.C. § 7434 claim where "[t]he complaint does not contain any details or factual allegations—other than the alleged FLSA and NYLL violations" in support); *Yahui Zhang v. Akami Inc.*, No. 15-CV-4946 (VSB), 2017 WL 4329723, at *5 (S.D.N.Y. Sept. 26, 2017). (rejecting plaintiff's argument that "since he was not properly compensated for non-tipped work, it is highly unlikely that Defendants reported accurate information on their federal and state income tax returns") (citation and quotation marks omitted). Here, Plaintiff has presented no evidence, such as Defendants' tax returns themselves, suggesting that they willfully filed fraudulent returns and thereby caused Plaintiff to sustain damages.

Accordingly, Plaintiff does not prevail under Count XIII.

## 11.   Count XIV: GBL § 349

Plaintiff's claim under GBL § 349 fails as a matter of law. This statute provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the

furnishing of any service in the state are hereby declared unlawful." *Id.* § 349(a). But it is well-established that a defendant may only be held liable under § 349 for "conduct … that is consumer-oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (N.Y. 1995). No such conduct was alleged, or proven, here.

Accordingly, Plaintiff does not prevail under Count XIV.

## 12. Prejudgment Interest

Plaintiff is entitled to prejudgment interest under Counts II, IV and V. *See* NYLL § 198(1-a). Such interest may accrue only on his actual damages and not on his liquidated damages. *See Gamero*, 272 F.Supp.3d at 515. Prejudgment interest is not available on statutory damages for violations of NYLL § 195(1)(a) or (3). *See id*.

"Courts applying the NYLL in wage-and-hour cases often choose the midpoint of the plaintiff's employment" in computing prejudgment interest. *Id.* (citations, internal quotation marks and alterations omitted). Under the unique circumstances of this case, however, having prejudgment interest accrue at the mid-point of Plaintiff's entire employment period would overcompensate him; the vast majority of Defendants' liability accrued after December 31, 2016, when the state minimum wage was increased.[9] Accordingly, the Court finds that the appropriate accrual date is June 30, 2017, which is the approximate mid-point between December 31, 2016 and December 29, 2017, the date Plaintiff left Sakura. In computing prejudgment interest, the Court applies a rate of 9% per annum. *See* CPLR § 5004.

Accordingly, prejudgment interest should be awarded in the amount of:

$4,024.53 x (650 ÷ 365) x 9% = $645.03.

---

[9] Defendants' cumulative liability for the period from August 19, 2016 to December 30, 2016 is only about $144.

## CONCLUSION

For the reasons set forth above, the Court concludes that Plaintiff is entitled to relief under Counts II, IV, V, VIII, and IX solely against Defendants Wang and Sakura. The Clerk of Court is directed to prepare a judgment reflecting this holding and setting forth Plaintiff's damages as $18,694.09, consisting of the following:

**Counts II, IV, and V:** $4,024.53 in unpaid wages under the NYLL; $645.03 in prejudgment interest; and $4,024.53 in liquidated damages.

**Count VIII:** $5,000.00 in statutory damages.

**Count IX:** $5,000.00 in statutory damages.

Pursuant to NYLL § 198(4), the judgment shall reflect that:

> [I]f any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent.

Plaintiff also is entitled to reasonable attorney's fees and costs under the NYLL. Accordingly, Plaintiff shall file a motion for fees and costs on or before **May 11, 2019**.

SO ORDERED.

Dated:  Brooklyn, New York
        April 11, 2019

/s_____
I. Leo Glasser                                          U.S.D.J.

# APPENDIX

## Plaintiff's Actual Compensation

| Period | # Weeks | Weekly Pay | Comp. |
|---|---|---|---|
| 8/19/16-8/21/16 | n/a | $282.47[a] | $282.47 |
| 8/22/16-10/8/17 | 59 | $375.00 | $22,125.00 |
| 10/9/17-10/15/17 | 1 | $290.00 | $290.00 |
| 10/16/17 – 11/19/17 | 5 | $375.00 | $1,875.00 |
| 11/20/17/11/26/17 | 1 | $500.00 | $500.00 |
| 11/27/17-12/3/17 | 1 | $400.00 | $400.00 |
| 12/4/17-12/10/17 | 1 | $550.00 | $550.00 |
| 12/11/17-12/17/17 | 1 | $720.00 | $720.00 |
| 12/18/17-12/24/17 | 1 | $680.00 | $680.00 |
| 12/25/17-12/31/17 | 1 | $320.00 | $320.00 |
| **Total** | | | **$27,742.47** |

## Required Compensation under FLSA

| Period | Min. Wage | Hours / Wk | # Weeks | Comp. |
|---|---|---|---|---|
| 8/19/16-8/21/16 | $7.25 | 29.0 | n/a | $210.2500 |
| 8/22/16-10/8/17 | $7.25 | 38.5 | 59 | $16,468.3750 |
| 10/9/17-10/15/17 | $7.25 | 29.5 | 1 | $213.8750 |
| 10/16/17-11/19/17 | $7.25 | 38.5 | 5 | $1,395.6250 |
| 11/20/17-11/26/17 | $7.25 | 48.5 | 1 | $382.4375 |
| 11/27/17-12/3/17 | $7.25 | 41.5 | 1 | $306.3125 |
| 12/4/17-12/10/17 | $7.25 | 50.5 | 1 | $404.1875 |
| 12/11/17-12/17/17 | $7.25 | 64.5 | 1 | $556.4375 |
| 12/18/17-12/24/17 | $7.25 | 58.0 | 1 | $485.7500 |
| 12/25/17-12/31/17 | $7.25 | 32.5 | 1 | $235.6250 |
| **Total** | | | | **$20,658.88** |

## Required Compensation under NYLL

| Period | Min. Wage | Hours / Wk | # Days / Wk with Spread of Hours > 10 | # Weeks | Comp. |
|---|---|---|---|---|---|
| 8/19/16-12/29/16 | $9.00 | 38.5 | 4 | 19 | $7,276.500 |
| 12/30/16 | $9.00 | 10.0 | 1 | n/a | $99.000 |
| 12/31/16 | $10.50 | 10.0 | 1 | n/a | $115.500 |
| 1/1/17 | $10.50 | 9.0 | 1 | n/a | $105.000 |
| 1/2/17-10/8/17 | $10.50 | 38.5 | 4 | 40 | $17,850.000 |
| 10/9/17-10/15/17 | $10.50 | 29.5 | 3 | 1 | $341.250 |
| 10/16/17-11/19/17 | $10.50 | 38.5 | 4 | 5 | $2,231.250 |
| 11/20/17-11/26/17 | $10.50 | 48.5 | 5 | 1 | $606.375 |
| 11/27/17-12/3/17 | $10.50 | 41.5 | 4 | 1 | $485.625 |
| 12/4/17-12/10/17 | $10.50 | 50.5 | 5 | 1 | $637.875 |
| 12/11/17-12/17/17 | $10.50 | 64.5 | 7 | 1 | $879.375 |
| 12/18/17-12/24/17 | $10.50 | 58.0 | 6 | 1 | $766.500 |
| 12/25/17-12/31/17 | $10.50[b] | 32.5 | 3 | 1 | $372.750 |
| **Total** | | | | | **$31,767.00** |

**NYLL Underpayment:** $31,767.00 - $27,742.47 = **$4,024.53**.

[a] Estimated by multiplying Plaintiff's presumed weekly pay of $375.00 by (29.0 ÷ 38.5), which is the ratio that the number of hours he is presumed to have worked during this period (29.0) bears to the total number of hours he worked during a regular week (38.5).

[b] Plaintiff did not work on 12/31/17, when the applicable minimum wage was increased to $12.00 per hour.